# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

SEPIDEH L. GHADRDAN,  et al.,

        Plaintiffs,

v.                                 CIVIL ACTION NO.   3:24-cv-00159-TEJ-DCK

ALEJANDRO MAYORKAS,
*In his official capacity as Secretary of*
*Homeland Security, Department of Homeland Security*, et al.,

        Defendants.

## MEMORANDUM OPINION AND ORDER

Pending before the Court is a "Petition For Judicial Review Of USCIS Decision To Deny Petitioner's Naturalization Application," (ECF No. 1), filed by Petitioners Sepideh Layeghi Ghadrdan ("Ghadrdan"), Nika Valaie Barhagh ("Barhagh"), and Gholamhossein Valaie Barhagh ("Gholamhossein") (collectively, "Petitioners").[1]   Petitioners seek *de novo* review of United States Citizenship and Immigration Services' ("USCIS") denials of their naturalization applications pursuant to 8 U.S.C. § 1421(c).   For the reasons discussed herein, the final decisions of the USCIS denying Petitioners' applications for naturalization are **AFFIRMED** to the extent consistent with this Memorandum Opinion and Order.

---

[1]  Ghadrdan is the biological mother of Barhagh, and Gholamhossein is the biological father of Barhagh.   (ECF No. 1 at 1, ¶ 2.)

1

# I. BACKGROUND

This matter arises out of the denial of the Petitioners' naturalization applications. Petitioners are Iranian nationals, who all received Lawful Permanent Resident ("LPR") status on May 11, 2010. (ECF No. 1 at 3–4, ¶¶ 11–13; *see also* ECF Nos. 1-2, 1-3, 1-4.) Petitioner Barhagh was 12 years old at the time. (*Id.* at 3, ¶ 12.) Subsequently, Petitioners spent a considerable amount of time in Iran.

On June 30, 2010, Petitioners traveled to Iran to care for Ghadrdan's father, who had been diagnosed with cancer. (ECF No. 1 at 4, ¶ 14.) They did not return to the United States until June 15, 2011. (*Id.*) On July 11, 2011, Petitioners once again traveled to Iran to care for Ghadrdan's father, and did not return to the United States until June 19, 2012. (*Id.*, ¶¶ 15–16.)

On July 16, 2012, Petitioners traveled to Iran due to the death of a relative. (*Id.*, ¶ 17; *see also* ECF Nos. 1-2, 1-3, 1-4.) They stayed there to help family members "cope with the loss of loved ones" and support Petitioner Barhagh "in completing her studies."[2] (ECF No. 1 at 4, ¶ 18.) They did not return to the United States until September 21, 2018. (*Id.*, ¶ 19; *see also* ECF Nos. 1-2, 1-3, 1-4; 48 at 2; 49 at 2.)

Thereafter, Petitioners quickly obtained drivers licenses, secured employment, established independent housing, and enrolled Plaintiff Barhagh in school. (*See* ECF No. 48 at 5; 49 at 9.) Additionally, there has only been one more trip to Iran: Petitioners Ghadrdan and Gholamhossein traveled to Iran from August 31, 2021, until November 14, 2021, to "check in on Ghadrdan's mother" to ensure her "emotional and mental health" were "stable." (ECF No. 1 at 4, ¶ 20; *see also* ECF Nos. 1-2, 1-3, 1-4.)

---

[2] Petitioners were evidently also prohibited from leaving Iran for 12 months in 2016 based on a conviction for attending a "mixed-sex birthday party." (*See* ECF Nos. 47 at 55–57; 48 at 8.)

On March 25, 2023, Petitioners sought to become naturalized United States citizens by filing Form N-400, Applications for Naturalization ("Applications") with USCIS, and appeared for individual naturalization interviews on August 3, 2023. (ECF No. 1 at 5, ¶¶ 21–22.) However, USCIS denied all three Applications, claiming that the Petitioners had "abandoned" their LPR status. (*Id.* at 5–6 at ¶¶ 23–24, 27–28, 31–32; *see also* ECF Nos. 1-2, 1-3, and 1-4.) Petitioners each filed a Form N-336, Request for a Hearing on a Decision in Naturalization Proceedings with USCIS. (ECF No. 1 at 5–6, ¶¶ 25, 29, 33; *see also* ECF Nos. 1-6, 1-8, and 1-10.) In response, USCIS issued written decisions denying the Form N-336 Requests and reaffirming its decisions to deny Petitioners' Applications. (ECF No. 1 at 5–6, ¶¶ 26, 30, 34.)

On February 12, 2024, Petitioners filed the pending Petition for judicial review, specifically requesting "a *de novo* hearing on their naturalization applications pursuant to [Immigration and Nationality Act] § 310(c), 8 U.S.C. § 1421(c)."[3] (ECF No. 1 at 8.) The Petition identified the United States Secretary of Homeland Security,[4] USCIS, the Director of USCIS, and the Director of the USCIS Charlotte Field Office as respondents (collectively, the "Government"). (*Id.* at 3, ¶¶ 7–10.) The Court held a hearing on September 22, 2025. (*See* ECF No. 47.) The parties then filed respective proposed findings of fact and conclusions of law. (ECF Nos. 48–50.)

As such, this matter is fully briefed and ripe for adjudication.

---

[3] Petitioners also request, *inter alia*, that the Court "grant Petitioners naturalization applications," (ECF No. 1 at 8), which the Court cannot do, *see* 8 U.S.C. § 1421(a) (granting the Attorney General the "sole authority to naturalize persons as citizens of the United States"). Petitioners further ask for an award of attorney's fees and costs and any "further relief as the Court deems just and proper," (ECF No. 1 at 8), but, as discussed below, Petitioners are not entitled to any relief. Thus, the Petition is **DENIED** insofar as it seeks these forms of relief.

[4] At the time, Alejandro Mayorkas was acting as the Secretary of Homeland Security, Mr. Ur M Jaddou was acting as the Director of USCIS, and Mr. Roxroy Collins was acting as the Director of the USCIS Charlotte Field Office. (ECF No. 1 at 3, ¶¶ 7–9.) However, pursuant to Federal Rule of Civil Procedure 25(d), the acting Secretary of Homeland Security, Director of USCIS, and Director of the USCIS Charlotte Field Office are automatically substituted. These positions may again change suddenly, and "any misnomer not affecting the parties' substantial rights must be disregarded." Fed. R. Civ. P. 25(d).

## II.    LEGAL STANDARD

Under the Immigration and Nationality Act ("INA"), noncitizens must satisfy three primary requirements, set out in 8 U.S.C. §§ 1427 and 1429, to become naturalized citizens. *Azumah v. United States Citizenship & Immigr. Servs.*, 107 F.4th 272, 273 (4th Cir. 2024).   First, an applicant must have "resided continuously" in the United States for at least five years "after being lawfully admitted for permanent residence."   8 U.S.C. § 1427(a)(1); *see also* 8 U.S.C. § 1429 ("[N]o person shall be naturalized unless he has been lawfully admitted to the United States for permanent residence.").   Second, an applicant must have continuously resided in the United States between the date of his application and the time he is granted citizenship.   8 U.S.C. § 1427(a)(2).   Third, an applicant must have been of "good moral character" during the five-year period preceding his application.   *Id.* at § 1427(a)(3).

If a noncitizen's application for naturalization is denied, he may seek judicial review in federal court.   *See* 8 U.S.C. § 1421(c).   "Such review shall be *de novo*, and the court shall make its own findings of fact and conclusions of law."   *Id.*; *see also Injeti v. USCIS.*, 737 F.3d 311, 315 (4th Cir. 2013) ("Courts review a decision denying a naturalization application *de novo*."); *accord Aparicio v. Blakeway*, 302 F.3d 437, 440 (5th Cir. 2002) ("Judicial review of naturalization denials is always available and is *de novo,* and is not limited to any administrative record but rather may be on facts established in and found by the district court."); *United States v. Hovsepian*, 359 F.3d 1144, 1162 (9th Cir. 2004) ("*[T]he district court has the final word* and does not defer to any of the INS's findings or conclusions."); *Chan v. Gantner*, 464 F.3d 289, 291 (2d Cir. 2006) (explaining that "the Court is not limited to the facts in the administrative record").   The noncitizen has the burden of showing his eligibility for citizenship by a preponderance of the

4

evidence, and any doubts should be resolved in favor of the United States. *See Cody v. Caterisano*, 631 F.3d 136, 142 (4th Cir. 2011) (quoting *Berenyi v. Immigration & Naturalization Service*, 385 U.S. 630, 637 (1967)); 8 C.F.R. § 316.2(b) ("The applicant shall bear the burden of establishing by a preponderance of the evidence that he or she meets all of the requirements for naturalization.").

### III. DISCUSSION

Petitioners contend that they have satisfied all three requirements for naturalization. (ECF No. 1 at 7, ¶¶ 37–39; ECF Nos. 48, 50.) Conversely, the Government claims that Petitioners have not satisfied the first or third requirements. (*See* ECF No. 49.) The Court agrees that Petitioners have not satisfied the first requirement.[5]

The INA provides, in relevant part, the following:

> No person, except as otherwise provided in this subchapter, shall be naturalized unless such applicant, (1) immediately preceding the date of filing his application for naturalization has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least five years **and** during the five years immediately preceding the date of filing his application has been physically present therein for periods totaling at least half of that time, **and** who has resided within the State or within the district of the Service in the United States in which the applicant filed the application for at least three months.

8 U.S.C. § 1427(a) (emphasis added). Thus, the first requirement has four sub-parts: (1) obtaining LPR status; (2) continuous residency in the United States for the five years immediately preceding an application for naturalization; (3) being "physically present" in the United States for "at least half" of those five years; and (4) residing in the state/district for which an application for naturalization is filed for at least three months. *See id.*

Of relevance, the Government argues that Petitioners cannot satisfy the first sub-part

---

[5] Because Petitioners have not satisfied the first requirement, the other two requirements are not discussed.

because they do not have LPR status. (ECF No. 49.) The Government's argument is contrary to clearly established law, as discussed below. Nevertheless, Petitioners have not met their burden of showing that they "resided continuously" in the United States for the five years preceding the filing of their Applications, under the second sub-part. (*Compare* ECF No. 47 at 35, ¶¶ 9–17, 48 at ¶¶ 23–25 (testimony that continuity of residence was not a basis for denial of the Applications) *with* 8 C.F.R. § 316.2(b) (placing burden on applicants to establish that *all* requirements are met).) Both of these sub-parts are discussed in turn below.[6]

### A. LPR Status

"Lawfully admitted for permanent residence" is a statutorily defined term, meaning "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed." 8 U.S.C. § 1101(a)(20). A noncitizen is regarded as having been "lawfully" admitted for permanent resident status only if he was legally entitled to that status when it was granted. *See Injeti*, 737 F.3d at 315-16 (affirming agency interpretation of "lawfully" as denoting "compliance with substantive legal requirements, not mere procedural regularity" (internal quotation marks omitted)). Put another way, "the term 'lawfully' denotes compliance with substantive legal requirements, not mere procedural regularity." *Nesari v. Taylor*, 806 F. Supp. 2d 848, 865 (E.D. Va. 2011) (internal quotations and citations omitted*); see also Fedorenko v. United States*, 449 U.S. 490, 505 (1981) (affirming the decision to denaturalize a plaintiff based on a finding that he was originally ineligible for a visa). Thus, "to establish that she was lawfully admitted for permanent residence, [an applicant] must do more than simply show that she was granted [lawful

---

[6] Because Petitioners have not satisfied the second sub-part, the third and fourth sub-part are not discussed.

6

permanent resident] status; she must further demonstrate that the grant of that status was in substantive compliance with the immigration laws." *Injeti*, 737 F.3d at 316.

Importantly, the IRA provides that a noncitizen with LPR status who returns to the United States from travel abroad is generally not regarded as "seeking an admission into the United States" for purposes of the immigration laws. 8 U.S.C. § 1101(a)(13)(C). There are exceptions, though. For example, there are exceptions for noncitizens who have abandoned or relinquished their LPR status, *id.* § 101(a)(13)(C)(i), or committed a crime of moral turpitude, *see id.* § 1101(a)(13)(C)(v); 8 U.S.C. § 1182(a)(2)(A)(i)(I). If one of those exceptions apply, an individual can be treated as seeking admission, deemed inadmissible, and placed into removal proceedings. *See* 8 U.S.C. §§ 1101(a)(13)(C)(v), 1227(a)(1)(A). Then, the noncitizen's LPR "status terminates upon entry of a final administrative order of exclusion, deportation, or removal." 8 C.F.R. § 1.2; *see also Azumah*, 107 F.4th at 276 (explaining that LPR "status continues until an order of deportation becomes administratively final"); *Lopez-Sorto v. Garland*, 103 F.4th 242, 250 (4th Cir. 2024) ("LPR status 'changes' when the [Board of Immigration Appeals] affirms an order of removal against an alien.")

In this case, Petitioners obtained LPR status in May 2010. Neither party disputes that the grant of that status was in substantive compliance with the immigration laws. (*See* ECF Nos. 48–50; *see also* ECF No. 47 at 17, ¶¶ 4–21.) Rather, the Government argues that Petitioners abandoned their LPR status by spending extended periods of time in Iran and failing to establish permanent residence in the United States after obtaining LPR status. (*See* ECF No. 49 at 2–10; *see also* ECF No. 47 at 31, ¶¶ 16–17.)

However, that is wrong. Specifically, the Government's argument fails because there has not been a "final administrative order of exclusion, deportation, or removal" for Petitioners. *See* 8 C.F.R. § 1.2; *Azumah*, 107 F.4th at 276; *Lopez-Sorto*, 103 F.4th at 250. The Fourth Circuit's recent decision in *Azumah* is illustrative.

In *Azumah*, the plaintiff was admitted to the United States as a lawful permanent resident in 2010. 107 F.4th at 274. In 2012, the plaintiff was convicted a misdemeanor offense of embezzlement under Virginia law. *Id.* He then traveled to Ghana in December 2013 and returned to the United States in January 2014. *Id.*

Upon the plaintiff's return, though, custom agents "noted that he appeared to be inadmissible by virtue of his embezzlement conviction" but deferred his inspection and paroled into the country. *Id.* A month later at his inspection, he was charged as inadmissible based on his embezzlement conviction, and the government initiated removal proceedings. *Id.* Thereafter, the plaintiff conceded that he was inadmissible because "he had been convicted of a crime involving moral turpitude" under 8 U.S.C. § 1101(a)(13)(C)(v), but the removal proceedings were eventually voluntarily dismissed. *Id.* at 274–75.

Then, in 2018, the plaintiff applied for citizenship. *Id.* at 275. USCIS denied his application, reasoning that, because of his embezzlement conviction in 2012, the plaintiff was seeking admission to the United States when he returned in 2014 and deemed inadmissible. *Id.* As such, the plaintiff could not satisfy the statutory requirement that he be "lawfully admitted for permanent residence," because he was not "lawfully admitted" to the country "upon [his] last entry" in 2014. *Id.*

8

The Fourth Circuit did not agree. To start, the *Azumah* Court clarified that the "lawfully admitted for permanent residence" requirement did *not* entail a lawful admission into the United States after obtaining LPR status. *Id.* at 276. The Court made clear that "the phrase 'lawfully admitted for permanent residence,' as used in the INA, has nothing to do with 'admission' at all." *Id.* The Court reiterated that this statutorily defined term of art "refers not to an applicant's *admittance* but instead to his *status* . . . of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed." *Id.* (citing 8 U.S.C. § 1101(a)(20)).[7]

From there, the Court explained that the plaintiff retained that LPR status—despite his crime of moral turpitude—because the government never successfully prosecuted removal proceedings:

> As we have noted, § 1101(a)(20) does not itself "define the moment at which lawful permanent residence ends." *Nwolise v. U.S. INS*, 4 F.3d 306, 310 (4th Cir. 1993). But agency regulations specify that "[s]uch status terminates upon entry of a final administrative order of exclusion, deportation, or removal." 8 C.F.R. § 1.2. And the longstanding Board of Immigration Appeals position, endorsed by our court, is to the same effect: "**[L]awful permanent residence status continues until an order of deportation becomes administratively final**, i.e., when the Board [of Immigration Appeals] renders its decision . . . or, where no appeal to the Board is taken, when appeal is waived or the time allotted for appeal has expired." *Nwolise*, 4 F.3d at 311 (cleaned up) (quoting *Matter of Lok*, 18 I. & N. Dec. 101 (BIA 1981)).

*Azumah*, 107 F.4th at 276 (emphasis added).

So too here. Like the plaintiff in *Azumah*, Petitioners were "admitted to the country in 2010 with lawfully obtained LPR status." *Id.* Perhaps Petitioners *could* have later been deemed

---

[7] At the hearing, the Government's witness, the senior immigration service officer at the Charlotte field office of the USCIS, testified that "lawfully admitted for permanent residence" refers to "all entries" into the United States. (ECF No. 47 at 43, ¶¶ 9–14.) In fact, the Government insisted that is how "lawfully admitted for permanent residence" is "defined by the law." (*Id.*) However, that interpretation is clearly contrary to well-established Fourth Circuit law.

9

inadmissible and placed into removal proceedings for abandoning their LPR status based on their extended stays in Iran, similar to the plaintiff in *Azumah* who committed a crime of moral turpitude. *See* 8 U.S.C. §§ 1101(a)(13)(C)(v), 1227(a)(1)(A). Yet, instead, Petitioners were consistently lawfully readmitted into the United States. (*See* ECF No. 1 at 4, ¶¶ 14–19; ECF No. 35-2 at 2–10; *but see* ECF No. 47 at 41, ¶¶ 3–8 (testimony that a United States Customs and Border Protection agent, who is "under terrific time crunches" and has "to make decisions fairly quickly based on the evidence that they have" may have "simply made a mistake").)

It is true that the Government has now initiated removal proceedings, and, unlike the facts of *Azumah*, those removal proceedings have not been voluntarily dismissed. (*See* ECF No. 44 at 6, n. 1 (noting that "removal proceedings are underway" with the next scheduled hearing on "July 7, 2026").) Nevertheless, like in *Azumah*, the Government has not "successfully prosecuted . . . removal proceedings" because, to date, there has not been a final removal order. *See* 107 F.4th at 276. Consequently, like the plaintiff in *Azumah*, Petitioners' LPR statuses have not yet "changed within the meaning of § 1101(a)(20)," and they still have "LPR status today." *Id.*; *see also* 8 C.F.R. § 1.2.[8]

Therefore, Petitioners have LPR status.

### B. Continuous Residency for Five Years

After a person has received LPR status, the INA requires an applicant to have "resided continuously" in the United States for five years "immediately preceding the date of filing his application for naturalization." 8 U.S.C. § 1427(a); *see also* 8 C.F.R. § 316.2(a)(3). As discussed above, this continuous residency requirement is distinct from the requirement to be

---

[8] Inexplicably, the Government does not even mention 8 C.F.R. § 1.2 or *Azumah*. (*See* ECF No. 49.)

"physically present" in the United States for "at least half" of those five years. Nevertheless, a noncitizen's prolonged absence of physical presence from the United States can have an effect on the continuous residency requirement, as it can break a "continuity of residency":

> Absence from the United States of more than six months but less than one year during the period for which continuous residence is required for admission to citizenship, immediately preceding the date of filing the application for naturalization, or during the period between the date of filing the application and the date of any hearing under section 1447(a) of this title, *shall break the continuity of such residence*, unless the applicant shall establish to the satisfaction of the Attorney General that he did not in fact abandon his residence in the United States during such period.

8 U.S.C. § 1427(b) (emphasis added); 8 C.F.R. § 316.5(c) (same).

Additionally, any absence "for a continuous period of one year or more during the period for which continuous residence is required for admission to citizenship (whether preceding or subsequent to the filing of the application for naturalization) shall break the continuity of such residence . . . ." *See* 8 U.S.C § 1427(b) (providing exceptions inapplicable here); 8 C.F.R. § 316.5(c) (same). If an applicant is absent from the United States in excess of one year, he "may file an application for naturalization four years and one day following the date of the applicant's return to the United States." 8 C.F.R. § 316.5(c)(1)(ii).

Here, Petitioners offer a calculation that, at face value, seems to indicate that they have satisfied the continuous residency requirement. (*See* ECF No. 48.) As discussed above, Petitioners filed their Applications on March 25, 2023. Thus, Petitioners reason, (ECF No. 48 at 10), and the Court agrees, that the start of the relevant five-year statutory period for continuous residency began on March 25, 2018. *See* 8 U.S.C. § 1427(a) (requiring five years continuous residency "immediately preceding the date of the filing of [an] application for naturalization").

While Petitioners were not in the United States from July 16, 2012, through September 21, 2018, they nevertheless contend that the continuous residency requirement is satisfied. To start, because the absence from July 16, 2012, through September 21, 2018, exceeded one year, Petitioners reason that the earliest they could apply for naturalization was four years and one day after September 21, 2018—which was September 22, 2022. *See* 8 C.F.R. § 316.5(c)(1)(ii). They did not apply for naturalization until March 25, 2023. Thus, they claim to have satisfied the four year and one day mandate. *See id.*

Further, Petitioners reason that the clock started on March 25, 2018, and their absence between March 25, 2018, and September 21, 2018, is less than six months.[9] (*See* ECF No. 48 at 5, 11.) While their *general* "absence from the United States" was more than one year, their "absence from the United States . . . *during the period for which continuous residency is required*" was less than 6 months. *See* 8 U.S.C § 1427(b) (emphasis added). Because the period for which continuous residency is required did not start until March 25, 2018, they reason that their absences prior to that date do not get calculated. (*See* ECF No. 48 at 5, 11.) Therefore, they claim that this absence did not break the continuity of their residency. (*See id.* at 11.)

Initially, Petitioners' analysis sounds right. Except, Petitioners did not *establish* a residency until September 2018, as discussed below. Thus, it does not make sense to say that their absence from March 25, 2018, until September 21, 2018, did not break the "continuity" of their residency. *Cf. Alvear v. Kirk*, 87 F. Supp. 2d 1241, 1243 (D.N.M. 2000) ("Although Plaintiff established physical presence in the United States during the five year period preceding the date of his application, he does not establish the whereabouts of his *actual* residence."). After all, to

_____

[9] Similarly, Petitioners reason that the absence between August 31, 2021, and November 14, 2021, was less than six months. (*See* ECF No. 48 at 5, 11.)

claim that an absence did not "break the continuity of residency," *see* 8 U.S.C. § 1427(b), necessarily implies that residency had already been established *before* that absence occurred. The flaw in Petitioners' logic is highlighted by basic principles of statutory interpretation. An analysis of Petitioners' residency and statutory interpretation are provided in turn below.

### 1. Petitioners' Residency

The INA defines "residence" as "the place of general abode; the place of general abode of a person means his principal, actual dwelling place in fact, without regard to intent." 8 U.S.C. § 1101(a)(33); *see also* 8 C.F.R. § 316.5(a) ("[A]n alien's residence is the same as that alien's domicile, or principal actual dwelling place, without regard to the alien's intent"). The statutory definition of "residence," in other words, requires a degree of primacy over other places of residence. *See, e.g.*, *De Rodriguez v. Holder*, 724 F.3d 1147, 1151 (9th Cir. 2013) ("The statute does not treat every dwelling in which an alien stays as a new residence; the text instructs courts to take a wider view, deeming the '*principal,* actual dwelling place' and 'the place of *general* abode' to be the residence."); *Michael v. INS*, 48 F.3d 657, 663 n.5 (2d Cir. 1995) ("We have previously described the term residency—as used in the immigration context—as 'an established abode, for personal or business reasons, permanent for a time.'" (quoting *Rosario v. INS,* 962 F.2d 220, 224 (2d Cir. 1992))). Further, the phrase "without regard to intent" simply means that the inquiry is objective, not subjective. *See Savorgnan v. United States*, 338 U.S. 491, 506 (1950) (explaining that a party's "intent as to her 'domicile' or as to her 'permanent residence,' as distinguished from her actual 'residence,' 'principal dwelling place,' and 'place of abode,' is not material.").

Here, Petitioners obtained LPR status on May 11, 2010. Between June 30, 2010, and

13

September 21, 2018, Petitioners spent most of their time Iran, and there is no indication that the United States was Petitioners' "residence" during that time.[10] During their limited time in the United States, they stayed with family members instead of obtaining their own housing. (ECF No. 49 at 4 (citing Petitioners' testimonies); *see e.g.*, ECF No. 47 at 92–93.) They did not procure jobs, enroll Petitioner Barhagh in school, obtain driver's licenses, open bank accounts, or pay taxes in the United States. (*See* ECF No. 49 at 4–6; ECF No. 48 at 6–8.) Conversely, they continued to live in their home, work, send Petitioner Barhagh to school, maintain driver's licenses, have bank accounts, and vote in elections—all in Iran. (*See* ECF No. 49 at 4–6; ECF No. 47 at 90–102, 140.)

Petitioners may have good reasons for some of these decisions.[11] As a matter of fact, they testified that they intended to live in the United States when they first arrived in 2010. (*See, e.g.*, ECF No. 47 at 132, ¶¶ 20–23.) However, the determination of Petitioners' residence is not subjective. *See* 8 U.S.C. § 1101(a)(33); 8 C.F.R. § 316.5(a); *Savorgnan*, 338 U.S. at 506.

Rather, *objectively*, from 2010 to 2018, Petitioners' "principal, actual dwelling place in fact" was Iran, not the United States. 8 U.S.C. § 1101(a)(33); 8 C.F.R. § 316.5(a); *Savorgnan*, 338 U.S. at 506; *see also Petition of Correa*, 79 F. Supp. 265, 268 (W.D. Tex. 1948) ("It was not

---

[10] Petitioners seem to believe that "residence" is synonymous with having LPR status. (*See* ECF No. 47 at 66, ¶¶ 11–13 (reasoning that, because they obtained LPR status in 2010, the "five-year period would have ended in 2015").) Not so. As discussed above, LPR status refers to an applicant's status "of having been lawfully *accorded the privilege of residing* permanently in the United States," *Azumah*, 107 F.4th at 276 (citing 8 U.S.C. § 1101(a)(20)) (emphasis added), while an applicant's "residence" is where he *actually lived*, *see* 8 U.S.C. § 1101(a)(33), regardless of the permission granted to him to reside in the United States.

[11] For example, Petitioners claim they could not afford to buy a house in the United States when they arrived in 2010, (*see, e.g.*, ECF No. 47 at 133, ¶¶ 3–5), could not sell their home in Iran from 2010–2012, (*see, e.g.*, *id.* at 116 at ¶¶ 5–8, 135 at ¶¶ 4–12, 149, ¶¶ 16–21), did not enroll Petitioner Barhagh in school because they only traveled to the United States during the summer, (*see, e.g.*, *id.* at 147, ¶¶17–24), and did not pay taxes in the United States because their income was below the threshold requirement, (*see, e.g.*, *id.* at 102, ¶¶ 19–24, 117 at ¶¶ 9–11).

14

the intent of Congress . . . to admit a person to citizenship who lives here in order to obtain better wages or improve his financial condition and at the same time raise and maintain a family, educate his children, buy his home and spend his money in a foreign country.").  In fact, in their Applications, Petitioners identified Iran as their residence until 2018.  (*See* ECF No. 47 at 24, ¶¶ 2–9; ECF No. 49 at 5; ECF No. 35-2 at 54; ECF No. 35-4 at 29)

When they returned to the United States in September 2018, Petitioners quickly obtained drivers licenses, secured employment, established independent housing, and enrolled Petitioner Barhagh in school.  (*See* ECF No. 48 at 2, 5; 49 at 9; *see also* ECF No. 47 at 22, ¶¶ 5–8; *id.* at 115–116, 119, 143–144.)  In doing so, they established a "residence" in the United States for the first time.  *See* 8 U.S.C. § 1101(a)(33); 8 C.F.R. § 316.5(a).  Thus, the "continuity of residency" did not begin until September 2018, at the earliest.  *See* 8 U.S.C. § 1427(a).

### 2.  Statutory Interpretation

Under the INA, an applicant must have "resided continuously" in the United States for "at least five years" immediately preceding an application for naturalization.  8 U.S.C. § 1427(a).  It is true that applicants can leave the United States for short periods of time without "break[ing] the continuity of such residence."  *See id.* § 1427(b).  Still, statutory interpretation and common sense require a residence to be established—first—before a "continuity of such residence" can be maintained or broken.

As always, statutory analysis begins with the statutory text.  *Maslenjak v. United States*, 582 U.S. 335, 341 (2017); *Chris v. Tenet*, 221 F.3d 648, 651–52 (4th Cir. 2000).  "[I]f the text of the statute evinces "a plain, nonabsurd meaning," then the court should not "read an absent word into the statute."  *Lamie v. United States Trustee,* 540 U.S. 526, 538 (2004); *see also Bates v.*

15

*United States*, 522 U.S. 23, 29 (1997) (holding that courts should "resist reading words or elements into a statute that do not appear on its face").   By the same logic, when the text of a statute evinces a plain, nonabsurd meaning, the Court should not *omit* a word from the statute.   *See Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (identifying the "cardinal canon" of statutory construction as follows: "a legislature says in a statute what it means and means in a statute what it says there").

As discussed above, "residence" means a person's "principal, actual dwelling place in fact, without regard to intent."   8 U.S.C. § 1101(a)(33); *see also* 8 C.F.R. § 316.5(a).   Because the INA does not define "continuity," the Court must apply the "ordinary, contemporary, common meaning."   *United States v. Powell*, 680 F.3d 350, 355 (4th Cir. 2012) (internal quotation marks omitted).   To do so, the Court should "not only look to the language itself, but also the specific context in which that language is used, and the broader context of the statute as a whole."   *Country Vintner of N.C., LLC v. E. & J. Gallo Winery, Inc.*, 718 F.3d 249, 258 (4th Cir. 2013).

"Continuity" is generally defined as "[t]he state, quality, or condition of being uninterrupted in progression, sequence, or succession; gapless connectedness."   *Continuity*, *Black's Law Dictionar*y (12th ed. 2024).   By extension, a "continuity of such residence" means a person's current residency that has not been broken.   In the context of § 1427(b), then, a "continuity of such residency" requires that an applicant must have already established a statutorily defined "residence" in the United States, which has not changed.

Reading § 1427 as requiring an applicant to establish a residence in the United States before a "continuity of such residency" can exist is clearly not absurd.   It is common sense.   Conversely, Petitioners' interpretation is absurd.   Section 1427(b) permits applicants to travel outside the

16

United States during the five-year statutory period without having to *restart* the clock. It surely was not intended to allow an applicant to simply *skip* the first six months of the five-year residency period without having first established a residence in the United States.[12]

Indeed, it appears that Congress intended to require a five-year term during which nonresidents could incorporate themselves into the country. *See, e.g.*, *In re Vasicek*, 271 F. 326, 329 (E.D. Mo. 1921) (reasoning that Congress intended to impose a "probationary term" during which the candidate could learn "the manners, laws, and government of this country"); *In re Di Giovine*, 242 F. 741, 742 (W.D.N.Y. 1917) ("In enacting the statute requiring aliens applying for citizenship to reside continuously in the United States for a period of 5 years, it was doubtless the intention of Congress to . . . give the applicants time in which to acquire the language and to familiarize themselves with our habits and institutions"). Thus, Congress's purpose in imposing the requirement would be thwarted if nonresidents could simply postpone the start of the five-year requirement by leaving the country.

Taking Petitioners' interpretation to an extreme demonstrates its absurdity. Consider an applicant whose five-year statutory period starts on January 1, 2010. Under the Petitioners' interpretation, this applicant could leave the United States on January 2, 2010, and return just shy of six months later on July 1, 2010; leave again on July 2, 2010, return just shy of six months later January 1, 2011; and continue this pattern for *another year* until he finally establishes a residence in the United States on July 1, 2012. Still, by January 2015, this applicant would have satisfied the five-year residency requirement because none of his absences exceeded six months and

---

[12] Petitioners go to great lengths in arguing that their absences were excused under the INA and codified regulations. (*See e.g.,* ECF No. 48 at 3–4; *see also generally* ECF No. 47.) Even if those absences were excused, though, Petitioners did not establish a residence in the United States prior to those absences.

therefore did not "break the continuity of residency" under § 1427(b).  Such an applicant, who had only resided in the country for 2.5 years, surely would not satisfy Congress's intent of requiring nonresidents to "reside[] continuously" to the United States for five years prior to applying for naturalization.

Put simply, it is axiomatic that something must exist before it can be broken.  It would undermine the naturalization process and common sense to hold that an applicant could maintain a "continuity of residency" that had not yet been established.[13]  Therefore, because Petitioners did not establish a residence in the United States until September 2018 at the earliest, they did not continuously reside in the United States for the five years preceding the filing of their Applications. At the very least, the Court has doubts that Petitioners satisfied the continuous residency requirement, which should be resolved in favor of the United States.  *See Cody*, 631 F.3d at 142

Accordingly, Petitioners have not met their burden of showing their eligibility for citizenship by a preponderance of the evidence.  *See id*.

### IV.    CONCLUSION

For these reasons, the final decisions of the USCIS denying Petitioners' applications for naturalization are **AFFIRMED** to the extent consistent with this Memorandum Opinion and Order. The Clerk is **DIRECTED** to remove this matter from the Court's active docket.

**IT IS SO ORDERED**.

---

[13] The Court notes that 8 C.F.R. § 316.5(c)(1)(ii) similarly states that "absences from the United States for a continuous period of one (1) year or more during the period for which continuous residence is required . . . *shall disrupt the continuity of the applicant's residence*."  8 C.F.R. § 316.5(c)(1)(ii) (emphasis added).  Section 316.5 goes on to provide that "[a]n applicant described in this paragraph who must satisfy a five-year statutory residence period may file an application for naturalization four years and one day following the date of the applicant's *return to the United States to resume permanent residence*."  *Id.* (emphasis added).  Although Petitioners' absence from July 16, 2012, through September 21, 2018, exceeded one year, they did not establish a residency in the United States until September 2018, as discussed above.  Thus, they did not "resume" their "permanent residence" upon return.  *Cf. id.* Accordingly, section 316.5's four year and one day mandate is inapplicable.

18

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:  April 30, 2026

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE

19